**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE APPLICATION OF HANWEI GUO
FOR AN ORDER TO TAKE DISCOVERY
FOR USE IN A FOREIGN PROCEEDING
PURSUANT TO 28 U.S.C. § 1782

Case No. 18 Misc. _____

**MEMORANDUM OF LAW IN SUPPORT OF PETITION**
**FOR AN ORDER TO TAKE DISCOVERY**
**FOR USE IN A FOREIGN PROCEEDING**
**PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

I.    FACTUAL BACKGROUND ...................................................................................3

    A.    Guo Invests In Ocean Music At The Urging Of Its Founder Guomin Xie .............3

    B.    Xie Handles Operations And Management For Ocean Music ................................5

    C.    Guo Is Defrauded Of His Investment In Ocean Music ...........................................6

    D.    Guo Discovers The Fraud ......................................................................................9

    E.    Ocean Music, Now Tencent Music Entertainment Group, Continues to Grow And Announces An American Initial Public Offering ...............................14

    F.    Guo Commences Arbitration ...............................................................................16

II.    ARGUMENT ........................................................................................................17

    A.    Legal Framework .................................................................................................17

    B.    Petitioner Satisfies The Statutory Requirements Of 28 U.S.C. § 1782 ...............18

        1.    The Underwriters Are "Found" In This District .......................................19

        2.    The Discovery Sought Is For "Use" In A Foreign Proceeding.................22

        3.    Petitioner Is An "Interested Person." ......................................................25

    C.    The Discretionary Factors Of Section 1782 Similarly Weigh In Favor of Permitting the Discovery Petitioner Seeks ..........................................................26

        1.    Because The Underwriters Are Not Parties To The Arbitration, The First *Intel* Factor Favors Granting Discovery ...........................................26

        2.    Because CIETAC Is Likely To Be Receptive To The Evidence Sought, The Second *Intel* Factor Favors Granting Discovery ..................27

        3.    Because Petitioner Does Not Seek To Circumvent Restrictions On Evidence, The Third *Intel* Factor Favors Granting Discovery .................29

        4.    Because The Requests Made In The Subpoenas Are Limited, The Fourth *Intel* Factor Favors Granting Discovery........................................29

III.    CONCLUSION.....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

### <u>CASES</u>

*Anhui Provincial Imp. & Exp. Corp. v. Hart Enterprises Int'l, Inc.*,
  No. 96 CIV. 128 (LAK), 1996 WL 229872 (S.D.N.Y. May 7, 1996) ............................ 24

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
  No. 17-MC-00216 (VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ...................... 19

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76(2d Cir. 2012)............................................................................ 18, 24, 26, 29

*Calbex Mineral Ltd. v. ACC Res. Co., L.P.*,
  90 F. Supp. 3d 442 (W.D. Pa. 2015)...................................................................... 23

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015)................................................................................. 26

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011).................................................................................. 23

*Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC*,
  No. CIV.A. 08-135-GMS, 2008 WL 4809035 (D. Del. Oct. 14, 2008) ...................... 23

*Coutinho Caro & Co. U.S.A. v. Marcus Trading, Inc.*,
  No. 3:95CV2362(AWT), 2000 WL 435566  (D. Conn. Mar. 14, 2000) ...................... 23

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995)................................................................................. 27

*Group Mex. SAB de CV v. SAS Asset Recovery, Ltd.*,
  821 F.3d 573 (5th Cir. 2016) ............................................................................... 19

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017)................................................................................. 24

*In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use
  in Foreign Proceedings*,
  773 F.3d 456 (2d Cir. 2014).................................................................................. 22

*In re Application of Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010)..................................................................... 23

*In re Application of Imanagement Serv*s.
  Ltd., No. CIV.A. 05-2311(JAG), 2006 WL 547949 (D.N.J. Mar. 3, 2006) .................... 28

*In re Application of OOO Promnesftstroy*,
  No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ................................ 27

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998)..................................................................................... 30

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002)..................................................................................... 18

*In re Ex Parte Application of Kleimar N.V.*,
   220 F. Supp. 3d 517 (S.D.N.Y. 2016)................................................................. 19, 23

*In re Ex Parte Application of TPK Touch Sols. (Xiamen) Inc.*,
   No. 16-MC-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17, 2016) ..................... 28

*In re Qualcomm Inc.*,
   162 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................... 19

*In re Republic of Ecuador*,
   Nos. C 11-80171, C 11-80172, 2011 WL 4434816 (N.D. Cal. Sep. 23, 2011)............... 19

*In re Servicio Pan Americano de Proteccion*,
   354 F. Supp. 2d 269 (S.D.N.Y. 2004)....................................................................... 28

*In re Super Vitaminas, S.A.*,
   No. 17-mc-80125-SVK, 2017 WL 5571037  (N.D. Cal. Nov. 20, 2017)....................... 19

*In re TPK Touch Sols. (Xiamen) Inc.*,
   No. 16-mc-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17, 2016)....................... 19

*Jiangsu Changlong Chemicals Co. v. Burlington Bio-Med. & Sci. Corp.*,
   399 F. Supp. 2d 165 (E.D.N.Y. 2005) ...................................................................... 23

*Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*,
   No. 17MC521, 2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) ........................................ 19

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
   2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ............................................................ 29

*Nat'l Broad. Co. v. Bear Stearns & Co.*,
   165 F.3d 184 (2d Cir. 1999) .................................................................................... 22

*Tianjin Port Free Trade Zone Int'l Trade Serv. Co. v. Tiancheng Chempharm, Inc. USA*,
   No. 17-CV-4130 (JS)(AYS), 2018 WL 2436990 (E.D.N.Y. May 30, 2018).................. 23

## STATUTES

15 U.S.C. § 77k(a)(5)........................................................................................... 25

28 U.S.C. § 1782.......................................................................................... passim

Petitioner Hanwei Guo ("Guo") respectfully submits this Memorandum of Law in support of his Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order authorizing him to obtain limited discovery from Deutsche Bank Securities Inc. ("DBS"), J.P. Morgan Securities LLC ("J.P. Morgan"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), and Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, the "Underwriters"), each of which resides or is found in this District, for use in a pending arbitration Guo has brought against various respondents ("Arbitration Respondents") before the China International Economic and Trade Arbitration Commission ("CIETAC"). This application is supported by the points and authorities below and the Declaration of Renita Sharma ("Sharma Decl."), Declaration of Ruojian Chen ("RC Decl."), and Declaration of Hanwei Guo ("Guo Decl.") filed concurrently herewith. The proposed order and the subpoenas *duces tecum* to be served on each of the Underwriters (the "Subpoenas") are attached as Exhibits to the Declaration of Renita Sharma.

## PRELIMINARY STATEMENT

Hanwei Guo, an early investor in Arbitration Respondents' nascent Chinese music streaming service, brings this Application seeking limited discovery for use in a pending arbitration (the "Arbitration") in China to regain control of assets stolen from him by the Arbitration Respondents' fraud.[1] From June 2012 to September 2013, Guo invested the equivalent of approximately USD $26 million in an early-stage online music business ("Ocean Music") run by Guomin Xie ("Xie"). Guo, an experienced real estate investor, provided thcapital but Xie took full control of the operational management of the Ocean Music entities, including, among others,

---

[1]  *See* RC Decl., Ex. A (Request for Arbitration, filed on September 27, 2018 and amended on October 9, 2018 before CIETAC, as translated (the "Request for Arbitration")). Capitalized terms not defined herein shall have the same meaning as ascribed to them in the Request for Arbitration.

Ocean Interactive (Beijing) Technology Co., Ltd ("Ocean Technology") and China Music Corporation ("CMC"). Unbeknownst to Guo, Xie used that operational control to misrepresent the fortunes of Ocean Music, lie to Guo about Ocean Music's prospects, and intimidate Guo into selling his Ocean Music shares for much less than their true value.

Specifically, in late 2013—unbeknownst to Guo—Ocean Music executed several term sheets with investors and merger partners that provided for lucrative new ventures, including new investments in Ocean Music totaling $100 million. Nonetheless, Xie misrepresented to Guo that Ocean Music was failing and that he should minimize his losses by selling his Ocean Music shares. Xie and his associates even went so far as to hire an individual, Haifeng Li ("Li"), to threaten Guo with government interference if he refused to complete the sale as Xie demanded. Faced with threats, coercion, and intimidation, and denied access to the information that would have revealed the true value of Ocean Music, Guo sold his shares.

Having stolen Ocean Music's equity, Xie proceeded to grow the company into a music streaming giant in the Chinese market, ultimately merging Ocean Music with its chief rival to create the world's largest online music platform, Tencent Music (Beijing) Co., Ltd. (f.k.a. Ocean Interactive (Beijing) Information Technology Co., Ltd.) ("Tencent Music"). Far from being a Chinese-only company, Tencent Music has assets located around the world and its parent company, Tencent Music Entertainment Group ("TME"), is preparing for an initial public offering before the Securities and Exchange Commission.

In 2018, Guo was approached by Xie's conspirator Li, who presented documentary proof of the conspiracy to defraud and threaten Guo into selling his equity in Ocean Music. Guo then investigated and obtained documents that corroborated Li's account, including documents that demonstrated that Xie had misrepresented the status of Ocean Music at the time he coerced Guo

2

into selling his shares. *See infra* § I(D). Having uncovered Xie's fraud, Guo initiated the now-pending CIETAC Arbitration against the Arbitration Respondents, including, among others, Xie, CMC, and Tencent Music. In aid of that Arbitration, Guo seeks to obtain limited discovery from the Underwriters of TME's IPO. This Application meets the statutory requirements of Section 1782: each of the Underwriters "resides or is found" in this District; the discovery sought by the Petitioner is for use in and relevant to the issues at stake in a foreign proceeding; and the discovery is sought by Petitioner, the claimant in that Arbitration. Moreover, each of the discretionary factors discussed by the Supreme Court in its *Intel* decision favors the discovery sought by Petitioner. Accordingly, Petitioner respectfully requests that this Court grant Petitioner's Application and permit Petitioner to serve the Subpoenas on the Underwriters.

## I.      FACTUAL BACKGROUND

### A.      Guo Invests In Ocean Music At The Urging Of Its Founder Guomin Xie

In the beginning of 2012, Hanwei Guo, a Chinese real estate investor, was introduced to Guomin Xie, who served as the vice president of public relations, general counsel and general manager of SINA Music, a unit of SINA Corporation (NASDAQ: SINA) since 1999.[2] In the beginning of 2012, Xie approached Guo for an investment in an online music business that Xie claimed had great potential in China.[3] Xie stated that he expected that the business would be able to make a profit in two years and would conduct a public stock offering in the United States within three years.[4] While Guo was a sophisticated real estate investor, he did not have experience in the music business.[5] However, based on Xie's representations, Guo agreed to provide the entire

---

[2]   Guo Decl. ¶ 3.
[3]   Guo Decl. ¶ 3; RC Decl., Ex. A (Request for Arbitration) at 5.
[4]   Guo Decl. ¶ 3; RC Decl., Ex. A (Request for Arbitration) at 5-6.
[5]   Guo Decl. ¶ 4.

capital investment for Xie's proposed venture.[6] As such, on May 31, 2012, Guo, Xie, and Guo's business associate Mr. Yu Cong formed Ocean Technology, which became the main operating entity for Ocean Music.[7] The parties intended that the money invested in Ocean Technology would be used for the proposed Ocean Music business.[8]  Ocean Technology was a Chinese entity.[9]

From June 2012 to September 2013, Guo invested a total of nearly CNY 180 million into Ocean Music entities, including, among others, Ocean Technology and Ocean Interactive (Beijing) Culture Co., Ltd. ("Ocean Culture").[10] Guo invested CNY 118.8 million in Ocean Technology, which constituted all registered and paid-in capital of Ocean Technology.[11] Guo invested funds directly and also loaned funds to Xie and Cong to purchase equity in Ocean Technology which they were to hold on Guo's behalf.[12] Xie and Guo signed borrowing agreements, one of them dated December 25, 2012, which provided for this arrangement.[13] Through this structure, Guo directly owned 50% of the equity of Ocean Technology, Xie held 37.5% of the equity of Ocean Technology on Guo's behalf, and Cong held 12.5% of the equity of Ocean Technology on Guo's behalf.[14] Guo also invested CNY 10 million in Ocean Culture, another operating entity for Ocean Music.[15] These funds were invested through a borrowing agreement with Mr. Chenyi Gui, by which Gui held 100% of Ocean Culture's equity on Guo's behalf.[16] As well as his equity, Guo also held options for 48.5 million shares of Ocean Music entities.[17]

---

[6]  Guo Decl. ¶ 4; RC Decl., Ex. A (Request for Arbitration) at 5-6.
[7]  Guo Decl. ¶ 5.
[8]  Guo Decl. ¶ 5.
[9]  Guo Decl. ¶ 5.
[10]  Guo Decl. ¶ 9; RC Decl., Ex. A (Request for Arbitration) at 5-6.
[11]  Guo Decl. ¶ 6; RC Decl., Ex. A (Request for Arbitration) at  5-6.
[12]  Guo Decl. ¶ 6.
[13]  Guo Decl. ¶ 6 & Ex. B ("Xie-Guo Borrowing Agreement").
[14]  Guo Decl. ¶ 6.
[15]  Guo Decl. ¶ 7.
[16]  Guo Decl. ¶ 7.
[17]  Guo Decl. ¶ 8.

### B.     Xie Handles Operations And Management For Ocean Music

While the goal of the Ocean Music business was to conduct a public stock offering in the United States, Xie informed Guo that the Chinese Government restricted the investment of foreign capital in the online music business.[18] As such, Ocean Technology could not directly conduct a public stock offering in the United States.[19] Therefore, Xie promised to create a foreign entity that would be able to receive foreign capital when Ocean Music conducted its planned American stock offering.[20]

To do so, and working within the framework of Chinese laws, Xie structured the ownership of Ocean Technology using a standard corporate model used by US and other foreign investors in China.[21] Xie formed a series of foreign and domestic entities to control Ocean Technology in China.[22] The foreign entity would exercise operational control over Ocean Technology through consulting and other agreements.[23] This common business arrangement is known in China as the Variable Interest Entities ("VIE") model.[24]

Guo agreed to the use of the VIE model in accordance with a proposed structure provided by Xie.[25] However, given Xie's background in law and the online music business, Xie controlled the creation of all the domestic and foreign entities for Ocean Music.[26] A diagram of the ownership and control structure as Xie promised to create it is shown at paragraph 13 of the Guo Declaration. However, as discussed below, the actual equity ownership percentages of the Ocean Music entities

---

[18]   Guo Decl. ¶¶ 3, 10.
[19]   Guo Decl. ¶ 10.
[20]   Guo Decl. ¶ 11.
[21]   Guo Decl. ¶ 11.
[22]   Guo Decl. ¶ 11.
[23]   Guo Decl. ¶ 11.
[24]   Guo Decl. ¶ 12; RC Decl., Ex. A (Request for Arbitration) at 6.
[25]   Guo Decl. ¶ 12 & n.5.
[26]   Guo Decl. ¶ 12.

were not what Xie promised they would be.[27]

### C.    Guo Is Defrauded Of His Investment In Ocean Music

In the first half of 2013, Xie began telling Guo that Ocean Music's business was not as successful as Xie had expected.[28] Xie stated that he had been unable to secure the necessary music licenses and that Ocean Music would not be able to meet its goals of making a profit in 2014 and conducting a public stock offering in the United States in 2015.[29]

To address these issues, Xie asked Guo for further capital investments.[30] Guo refused, as according to Xie, Xie had already failed to meet his anticipated goals for Ocean Music.[31] In addition, on October 8 and 9, 2013, Guo visited Ocean Technology's office in Tsinghua Science Park, Beijing to seek information about Ocean Music's operations and finances.[32] Guo met with Xie and asked him to provide all agreements Ocean Music had signed with third parties, as well as the business licenses and official seal of each Ocean Music company.[33] On October 10 and 11, 2013, Xie provided a list of documents and represented to Guo that the list included all agreements Ocean Music had signed with third parties (the "Agreement List").[34] Guo subsequently learned that the Agreement List failed to include certain key agreements with third party investors and business competitors.[35] *See also infra*, § I(D).

In the evening of October 10, 2013, Xie and Guo met at the Grand Hyatt Beijing Hotel.[36] Xie again claimed that Ocean Music was running into financial difficulties and Ocean Music

---

[27]  Guo Decl. ¶ 13.
[28]  Guo Decl. ¶ 15.
[29]  Guo Decl. ¶ 15.
[30]  Guo Decl. ¶ 16.
[31]  Guo Decl. ¶ 16.
[32]  Guo Decl. ¶ 17.
[33]  Guo Decl. ¶ 17.
[34]  Guo Decl. ¶ 18, n.6, & Ex. D (Agreement List).
[35]  Guo Decl. ¶ 18.
[36]  Guo Decl. ¶ 20.

would be unprofitable and very unlikely to go public in the short term.[37] As a result, Xie offered to acquire Guo's 62.5% equity stake in Ocean Technology (consisting of Guo's direct equity stake and the equity stake held by Cong on Guo's behalf) for a total of CNY 130 million.[38]

Guo rejected Xie's offer for three reasons: *first*, because Xie's offer did not compensate him for the 37.5% equity stake in Ocean Technology held by Xie on his behalf; *second*, because Guo did not believe Xie's offer provided fair value for his 62.5% equity stake in Ocean Technology; and *third*, because Guo wish to retain the stock options he held in Ocean Music.[39] Guo told Xie that Guo planned on owning his equity in Ocean Music for the long term.[40]

Several days later, in mid-October, 2013, Xie asked Guo to meet him at a coffee shop on the second floor of the KunLun Beijing Hotel.[41] Xie arrived with the following individuals: (1) Liang Tang ("Tang"), who Guo later learned had already invested in CMC, (2) Haifeng Li, who claimed that he worked for the Government of China's Atomic, Hydrogen Bombs and Satellite Office (the "AHBSO"), (3) another person who claimed that he worked for AHBSO (the "AHBSO Staff"), and (4) a person referring to himself as "General Zhang."[42]

Li told Guo that Ocean Music had become a national project and would be run by the Chinese Government.[43] He suggested that Guo should withdraw from Ocean Music.[44] Li stated that he had investigated Guo through the Department of Public Security of Henan Province and found that Guo was involved in a major traffic accident involving six deaths in April 2013.[45] Li

---

[37]  Guo Decl. ¶ 20.
[38]  Guo Decl. ¶ 20.
[39]  Guo Decl. ¶ 21.
[40]  Guo Decl. ¶ 21.
[41]  Guo Decl. ¶ 22.
[42]  Guo Decl. ¶ 22.
[43]  Guo Decl. ¶ 23.
[44]  Guo Decl. ¶ 23.
[45]  Guo Decl. ¶ 23.

also stated that he had investigated Guo's businesses and found "irregularities."[46] Li stated that if Guo refused to sell his stake in Ocean Music, the Department of Public Security of Henan Province would conduct further investigations into those and other matters.[47] General Zhang and the AHBSO Staff concurred with Li.[48] During that meeting, Xie again represented to Guo that Ocean Music had operational difficulties, would not be profitable, and would be unlikely to go public as planned in the United States.[49] He further represented that Ocean Music would require investments of several hundred million CNY to continue its operations.[50]

In late October 2013, Li had several other meetings with Guo, where he reiterated his threats that if Guo refused to sell his stake in Ocean Music as Xie suggested, the Department of Public Security of Henan Province would conduct further investigations.[51]

Guo understood the statements by Li, General Zhang, and the AHBSO Staff to be threats of retaliation against Guo if Guo refused to sell his stake in Ocean Music.[52] Guo understood that Li, General Zhang, and the AHBSO Staff had the power to significantly disrupt his personal and business relationships and to cause him and his family significant damage if he did not comply.[53] Based on these representations and threats, Guo felt he had no choice but to sell his interests in Ocean Music.[54]

On November 7, 2013, Guo agreed to transfer his equity interests in Ocean Music to Xie for a total consideration of CNY 158 million through a Framework Agreement.[55] The Framework

---

[46] Guo Decl. ¶ 23.
[47] Guo Decl. ¶ 23.
[48] Guo Decl. ¶ 23.
[49] Guo Decl. ¶ 24.
[50] Guo Decl. ¶ 24.
[51] Guo Decl. ¶ 25.
[52] Guo Decl. ¶ 26.
[53] Guo Decl. ¶ 26.
[54] Guo Decl. ¶ 27.
[55] Guo Decl. ¶ 27 & Ex. J (Framework Agreement), § I.

Agreement required that "Guomin Xie, on behalf of the management team, should sign a letter of confirmation confirming that Xie has fully disclosed the operation and credit and debt situations of [various Ocean Music entities] to Hanwei Guo, Yu Cong, and Chenyi Gui."[56] On December 1, 2013, on behalf of the Ocean Music entities, Xie issued a Letter of Confirmation to Guo, Cong, and Gui, confirming and promising that "Guomin Xie and his management team have fully disclosed to [Hanwei Guo] the operation, assets, and all the relevant credit and debt situations of [various Ocean Music entities] as of the date of this Confirmation."[57]

### D.  Guo Discovers The Fraud

In 2018, Guo discovered that the representations to Guo made by Xie and others to induce Guo to sell Guo's equity interests in Ocean Music were fraudulent.[58] Guo was approached by Li, who informed Guo that he had been induced by Tang and Xie to aid them in defrauding Guo.[59] Li told Guo that on October 15, 2013, Tang and Li had signed a Cooperation Agreement, which specified that Li would obtain Guo's agreement to transfer Guo's equity in Ocean Music for a price of 1.2 times the amount of Guo's original investment.[60] In return, the existing shareholders of CMC (namely, Xie) would transfer to Li 1.5 million shares of CMC, then worth approximately USD $3 million.[61] As a result of the Cooperation Agreement, Li had misrepresented the financial situation of Ocean Music, aided Xie in his misrepresentations, and made the threats against Guo.[62] However, Li informed Guo that Tang had breached the Cooperation Agreement by refusing to transfer 1.5 million shares of CMC.[63] As such, Li had decided to inform Guo of the fraud.[64]

---

[56]  Guo Decl. ¶ 28 & Ex. J (Framework Agreement), § IX (G).
[57]  Guo Decl. ¶ 29 & Ex. K (Letter of Confirmation), § 1.
[58]  Guo Decl. ¶ 30.
[59]  Guo Decl. ¶ 30.
[60]  Guo Decl. ¶ 31 & Ex. L (Cooperation Agreement), § 1.
[61]  Guo Decl. ¶ 31 & Ex. L (Cooperation Agreement), § 2.
[62]  Guo Decl. ¶ 32.
[63]  Guo Decl. ¶ 33.

After Li provided Guo with his information, Guo investigated further and discovered that Xie had made six misrepresentations that were critical to inducing Guo to sell.[65]

*First,* Xie misrepresented the operational and financial situation of Ocean Music. In October 2013, before Guo was forced to transfer his Ocean Music equity to Xie, Xie repeatedly claimed that Ocean Music was facing operational difficulties, was running out of money, and had been unable to secure partnership agreements.[66] However, Guo later realized this was inaccurate. Guo obtained a term sheet, which provided that PAG Asia Capital would invest USD $100 million in Ocean Music before October 18, 2013 (the "PAG Term Sheet").[67] Xie signed the PAG Term Sheet on September 27, 2013, before his meetings with Guo and before Xie provided Guo with the Agreement List on October 10 and 11, 2013.[68]

In addition, Guo obtained term sheets for Ocean Music's acquisition of Yeelion Inc. ("Yeelion") and merger with Kugou Computer Technology Co., Ltd. ("Kugou"). According to the Yeelion term sheet, dated September 6, 2013, CMC planned on acquiring Yeelion for USD $100 million, including USD $70 million in cash.[69] And according to the Kugou Term Sheet, dated September 12, 2013, CMC would finish its next round of financing by October 31, 2013 and would merge with Kugou.[70] Moreover, contrary to Xie's representations, the Kugou Term Sheet stated that "CMC officially started operations in 2013, and is expected to achieve profitability in the first year."[71]

Together, the deals with PAG Asia Capital, Yeelion, and Kuguo clearly addressed Ocean

---

[64]   Guo Decl. ¶ 33.
[65]   Guo Decl. ¶ 34.
[66]   Guo Decl. ¶ 42.
[67]   Guo Decl. ¶ 43 & Ex. G (PAG Term Sheet).
[68]   Guo Decl. ¶¶ 16 & 43.
[69]   Guo Decl. ¶ 44 & *id.* at Ex. H, Yeelion Term Sheet.
[70]   Guo Decl. ¶ 44 & *id.* at Ex. I, Kugou Term Sheet, §§ 1.2 and 2.2.
[71]   Guo Decl. ¶ 44 & *id.* at Ex. I, Kugou Term Sheet, §3.

Music's purported capital and partnership needs. The contracts, each of which was executed prior to Xie's representations at his meetings with Guo—but which Xie neither disclosed nor included in the Agreement List or the Letter of Confirmation—demonstrate that Xie intentionally misrepresented Ocean Music's operational and financial situation to induce Guo's sale.

*Second*, Xie and his associates significantly underrepresented the value of Guo's equity stake in Ocean Music. As a result of Xie and his associates' misrepresentations about the value of Ocean Music, Guo agreed to resell his 62.5% equity stake in Ocean Music at a total price of CNY 158 million, which corresponds to a total value for Ocean Music of CNY 252.8 million.[72] However, the draft Share Purchase Agreement between CMC and Tang's company, China Investment Financial Holdings, Corp. ("CIFH"), dated June 2013—four months prior to Guo's sale—suggested that CIFH valued CMC at between USD $81.28 million to USD $120 million, or approximately between CNY 556.17 million to CNY 821 million.[73] These estimated values were about two to four times the price at which Guo resold his 62.5% equity stake.[74]

Similarly, Article 2.2 of the Kugou Term Sheet suggested that CMC would merge with Kugou Music at an overall valuation of USD $200 million, or approximately CNY 1.37 billion.[75] The Kugou Term Sheet was signed by CMC and Kugou Music in September 2013, prior to Xie and his associates defrauding Guo.[76] In other words, through the transaction agreed in the Framework Agreement, Xie obtained Guo's 62.5% equity stake in Ocean Music for some USD

---

[72] Guo Decl. ¶ 46 & Ex. J (Framework Agreement).
[73] Guo Decl. ¶ 47 & Ex. F (CMC-CIFH SPA), § 2.2, "Consideration," where CIFH agreed to purchase 30,000,000 CMC shares, representing a 37.5% equity stake per Schedule A, at a price of USD 1.5 per share, USD 1.3 per share, and USD 1.016 per share under different scenarios. Under the first scenario, CIFH would pay USD 45 million (30 million shares * USD 1.5 per share) to purchase a 37.5% equity stake in CMC, which means the total value of CMC could be estimated as USD 120 million, or approximately CNY 821 million. Under the third scenario, CIFH would pay USD 30.48 million to purchase a 37.5% equity stake in CMC, representing an estimated total value of USD 81.28 million, or CNY 556.17 million.
[74] Guo Decl. ¶ 47.
[75] Guo Decl. ¶ 48 & Ex I (Kugou Term Sheet), § 2.2.
[76] Guo Decl. ¶ 48.

$23 million, several times less than what they had valued it in the draft Share Purchase Agreement and the Kugou Term Sheet. Had Guo known that CMC was valued by Tang, Xie, or Kugou at USD $81.28 million, USD $120 million, or USD $200 million, Guo would not have agreed to sell his 62.5% equity stake at CNY 158 million (approximately USD $23 million).[77]

*Third*, Guo learned that Xie's misrepresentations were longstanding. In fact, Xie had created a shareholding structure for CMC that was different than the structure he promised to create; in fact, the shareholding structure Xie created diluted Guo's equity and was contrary to their agreement.[78] Under Xie and Guo's agreement, the shareholding structure of CMC was to be consistent with the shareholding structure of Ocean Technology; Cong and Guo together held 62.5 of the equity in Ocean Technology and were to hold 62.5% of the equity in CMC through China Music Holdings Limited ("CMHL").[79] This proposed VIE structure was reflected in the ownership chart Xie provided to Guo.[80] However, Xie actually incorporated CMC with 50% owned by CMHL and 50% owned by Guomin Holdings Ltd. ("GMHL"), an entity solely owned by Xie.[81]  As such, Guo was defraud of 12.5% of his equity.

*Fourth*, at some point between June 2012 and June 2013, Xie changed the shareholding structure of CMC, again without Guo's approval.[82] Unbeknownst to Guo, Xie negotiated and drafted a Share Purchase Agreement and a Shareholders Agreement with Tang's company CIFH.[83] In the draft Share Purchase Agreement between CMC and CIFH dated June 21, 2013, Schedule A showed that the pre-closing shareholding structure was as follows: GMHL and CMHL each held

---

[77] Guo Decl. ¶ 49.
[78] Guo Decl. ¶ 35.
[79] Guo Decl. ¶ 36.
[80] *See* Guo Decl. ¶ 13.
[81] Guo Decl. ¶ 36.
[82] Guo Decl. ¶ 37.
[83] Guo Decl. ¶ 38.

40% in CMC, and EMI Music International Services Limited ("EMI") held 20% in CMC.[84] However, per his agreement with Xie, Guo (through CMHL) was supposed to hold 62.5% of CMC; GMHL and EMI's equity percentages were to be 25% and 12.5%, respectively.[85] Moreover, Schedule A showed that the post-closing shareholding structure would be that GMHL and CMHL would each hold 25% of CMC, EMI would hold 12.5%, and CIFH would hold 37.5%.[86] In effect, via the transaction, GMHL and EMI's inflated equity percentages would be maintained, while CMHL's already decreased percentage was further diluted.[87] Indeed, Article 9.3 of the Draft CMC Shareholder Agreement specifically prohibits the dilution of GMHL's equity stake and stipulates that the percentage of shares held by GMHL shall be no less than 25% of the total issued and outstanding shares of CMC at all times.[88]

*Fifth*, Xie misappropriated the 37.5% equity stake he held on Guo's behalf and violated their borrowing agreements. Pursuant to the borrowing agreements, Guo loaned Xie 44.55 million CNY to purchase a 37.5% equity stake in Ocean Technology that Xie was to hold on Guo's behalf.[89] According to the borrowing agreements, Xie could not, without Guo's prior written

---

[84]   Guo Decl. ¶ 38 & Ex. F (Draft CMC-CIFH SPA), Schedule A.
[85]   Guo Decl. ¶¶ 13, 38-39.
[86]   Guo Decl. ¶ 39.
[87]   Guo Decl. ¶ 39. The post-closing shareholding structure is also confirmed by another term sheet that was executed by Xie without Guo's authority, the Kugou Term Sheet CMC signed on September 12, 2013, which showed that CIFH was the largest shareholder of CMC. Guo Decl. ¶ 40 & Ex. I (Kugou Term Sheet), § 1.1.
[88]   Guo Decl. ¶ 39 & Ex. E (Draft CMC Shareholder Agreement), § 9.3 ("Each of the Shareholders and the Company agrees that at any time before a Qualified IPO, the percentage of Ordinary Shares (assuming the conversion of all securities convertible into Ordinary Shares and exercise of all warrants, options and other securities exercisable for Ordinary Shares) held by GMHL shall be no less than 25% of the then issued and outstanding Ordinary Shares of the Company (assuming the conversion of all securities convertible into Ordinary Shares and exercise of all warrants, options and other securities exercisable for Ordinary Shares). In the event of issuance of new Shares by the Company in satisfaction of the subscription by any Potential Investors or Strategic Investors in accordance with Section 9.1 (Reservation of Shares) and exercise of the right to follow-on subscriptions provided in Section 9.2 (Further Subscription), the Company shall allot and issue such number of additional Shares to GMHL for nominal consideration such that the shareholding of GMHL shall at all times be no less than 25% of the total issued and outstanding Ordinary Shares of the Company (assuming the conversion of all securities convertible into Ordinary Shares and exercise of all warrants, options and other securities exercisable for Ordinary Shares).")
[89]   Guo Decl. ¶ 51.

consent, transfer, or grant that equity stake, in part or in whole, to any third party.[90] At the time Xie coerced Guo into signing the Framework Agreement and selling Guo's 67.5% equity stake in Ocean Music, Xie simply retained the 37.5% equity stake that Xie held on Guo's behalf.[91] Xie claimed that it was important that Xie remain listed as a shareholder in Ocean Music to attract investment, and that he would continue to hold the shares on Guo's behalf.[92] Nonetheless, on March 10, 2014, Xie secretly transferred the equity in Ocean Technology, including the 37.5% equity held on Guo's behalf pursuant to the Borrowing Agreement, to Kugou without informing Guo or seeking Guo's consent.[93]  Xie has not paid back the CNY 44.55 million loan.[94]

*Sixth*, as discussed *supra*, Guo held options for 48.5 million shares in CMC. The draft Shareholders Agreement among CMC, CIFH, and CMHL (which was negotiated without Guo's knowledge or approval) acknowledged those options.[95] However, the Framework Agreement and its related agreements, which Guo was coerced and defrauded into signing, cancelled those options without compensation.[96]

### E.   Ocean Music, Now Tencent Music Entertainment Group, Continues to Grow And Announces An American Initial Public Offering

Contrary to Xie's representations regarding Ocean Music's financial state (which omitted mention of the crucial agreements with PAG Asia Capital, Yellion, and Kuguo), Ocean Music has grown significantly since Guo was defrauded of his investment. In April 2014, Ocean Music obtained an investment from Tencent Holdings Limited ("Tencent"), one of China's largest

---

[90]  Guo Decl. ¶ 52 & Ex. C (Xie-Guo Borrowing Agreement), § 3.2.
[91]  Guo Decl. ¶ 52.
[92]  Guo Decl. ¶ 52.
[93]  Guo Decl. ¶ 52 & Ex. N (Agreements Regarding Share Transfers).
[94]  Guo Decl. ¶ 52.
[95]  Guo Decl. ¶ 54 & Ex. E (Draft CMC Shareholder Agreement), § 9.2.
[96]  Guo Decl. ¶ 54.

internet companies; Tencent acquired 15.8% of the equity of CMC, the main Ocean Music entity.[97] From 2014 to 2016, Ocean Music's online streaming presence continued to grow.[98] On July 12, 2016, Tencent acquired control of Ocean Music outright.[99] Ocean Music and Tencent combined their online music businesses, leaving Tencent as an owner of 61.6% of CMC.[100] In December 2016, CMC was renamed Tencent Music Entertainment Group ("TME"). [101] The newly-established TME became China's largest online music platform.[102] Xie was named Co-President and Director of TME.[103]

As TME, the business has continued to grow. In December 2017, music giant Spotify Technology, S.A. and TME conducted a share swap, which valued TME at approximately $12 billion USD.[104] On April 23, 2018, various media outlets reported that TME planned to make an initial public offering in the United States in late 2018.[105] The offering was expected to raise "billions in proceeds."[106] The Wall Street Journal noted that "Tencent Music was created in mid-2016 after Tencent Holdings bought a controlling stake in China Music Corp. and combined it with Tencent's existing streaming business."[107]

On May 30, 2018, the press reported that TME had hired several investment banks to arrange the IPO.[108] On October 2, 2018, TME filed for a United States initial public offering with

---

[97]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 89 of 409.
[98]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 89 of 409.
[99]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 8 of 409.
[100]  Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 13 of 409.
[101]  Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 13 of 409.
[102]  Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 7 of 409.
[103]  Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1) at 185 of 409.
[104]  Sharma Decl. Ex. 15 (NASDAQ.com Article).
[105]  Sharma Decl. Ex. 14 (Wall Street Journal Article) & 15 (NASDAQ.com Article).
[106]  Sharma Decl. Ex. 14 (Wall Street Journal Article); see also Ex. 13 (Financial Times Article).
[107]  Sharma Decl. Ex. 14 (Wall Street Journal Article).
[108]  Sharma Decl. Ex. 13 (Financial Times Article).

the Securities and Exchange Commission.[109] TME's filing disclosed five major underwriting banks, including each of the four Underwriters.[110] On December 3, 2018, TME filed an Amendment to its Form F-1 with the Securities and Exchange Commission, which disclosed the same underwriting banks.[111]

### F.    Guo Commences Arbitration

After discovering that Li and Xie had misrepresented the financial situation of Ocean Music, that Xie had transferred the shares of Ocean Technology in violation of the Borrowing Agreement, that Li had aided Xie in his misrepresentations, and that Li had fraudulently made threats against Guo, Guo commenced an arbitration to vindicate his rights on September 27, 2018.[112]

CIETAC, before which the Arbitration is pending, was established in 1956 by the Government Administration Council of the Central People's Government of the People's Republic of China (the "Council").[113]  By a Decision adopted on May 6, 1954, the Council determined that "[t]here shall be established, within the China Council for the Promotion of International Trade, a Foreign Trade Arbitration Commission (hereinafter referred to as the Arbitration Commission)."[114]  The China Council for the Promotion of International Trade is a foreign trade

---

[109]   Sharma Decl., Ex. 6 (Form F-1).
[110]   Sharma Decl., Ex. 6 (Form F-1) at 3.
[111]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1).
[112]   *See* RC Decl., Ex. A (Request for Arbitration). The Arbitration was commenced pursuant to, *inter alia*, the arbitration provision of the Framework Agreement, which states that "[a]ny dispute arising out of the interpretation and performance of this Agreement shall be settled by the Parties herein through joint efforts and friendly negotiations. In case the dispute is not resolved within thirty (30) days following the commencement of negotiations, any Party may submit the dispute to China International Economic and Trade Arbitration Commission (CIETAC). CIETAC shall then make a final ruling according to the arbitration procedures and rules in effect at the time the arbitration is initiated. The arbitration shall take place in Beijing."
[113]   RC Decl., Ex. B (May 6, 1954 Council Decision).
[114]   RC Decl., Ex. B (May 6, 1954 Council Decision) ¶ 1. Previously known as the "Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade Arbitration" and subsequently the "Foreign Economic and Trade Arbitration Commission of the China Council for the Promotion of International Trade", CIETAC adopted its current name in 1988. RC Decl. ¶ 8.

and investment promotion agency of the Chinese government.[115]  In accordance with the New York Convention, CIETAC awards are recognized and enforceable in 156 countries.[116] CIETAC acts as a decisionmaker; it permits the gathering and submission of evidence; it resolves the dispute; and it issues a binding order.[117] CIETAC revised and adopted its currently effective rules in 2015.[118]

The Arbitration was commenced against respondents Guomin Xie, China Music Corporation, China Publishing Corporation, China Investment Financial Holdings, CORP., Ocean Technology, Ocean Culture, Tencent Music (f.k.a. Ocean Interactive (Beijing) Information Technology Co., Ltd.), and Xiaotao Chen.[119] The Arbitration seeks a declaration that the Framework Agreement and related agreements are invalid because they were based on fraud and coercion, and resulting damages.[120]

## II.   ARGUMENT

### A.   Legal Framework

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a pending or reasonably contemplated foreign proceeding. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

---

[115]  RC Decl. ¶ 9.
[116]  RC Decl. ¶ 10.
[117]  RC Decl. ¶ 11.
[118]  RC Decl. ¶ 12 & Ex. C, CIETAC Arbitration Rules (Revised and adopted by the China Council for the Promotion of International Trade/China Chamber of International Commerce on November 4, 2014. Effective as of January 1, 2015).
[119]  RC Decl., Ex. A (Request for Arbitration) at 1-2.
[120]  RC Decl., Ex. A (Request for Arbitration) at 5.

28 U.S.C. § 1782.

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). If the three statutory requirements are satisfied, courts consider discretionary factors in deciding whether to grant a Section 1782 application, including (1) whether discovery is sought from a participant in the foreign proceeding who is accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the tribunal to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *Id.* at 80-81 (citing *Intel*, 542 U.S. at 264-65).

Both the Supreme Court and this Court have acknowledged that Congress intended to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

### B.     Petitioner Satisfies The Statutory Requirements Of 28 U.S.C. § 1782

Petitioner satisfies the three statutory requirements of Section 1782: (1) each of the Underwriters is "found" in the Southern District of New York; (2) the requested information is for "use" in a foreign proceedings; and (3) Petitioner is an "interested person" as the claimant in that foreign proceeding.

### 1.    The Underwriters Are "Found" In This District

A corporation is "found" in the District where it is "essentially at home."  *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018). Courts have looked to a corporation's principal place of business to determine where it is "essentially at home."  *Id.*; *see also Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is "at home" for the purpose of constitutional due process only in a state that is the corporation's place of incorporation or its principal place of business.") (*quoting Daimler* 761 & n.19) (emphasis added). In addition, Courts in this District have typically held that an entity is "found" in this District if it has a "systematic and continuous" presence here. *See In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this District).[121]

Each of the Underwriters satisfy the first statutory prong of Section 1782 because they maintain their principal place of business within this District and engage in the sort of systematic and continuous activities that courts have considered sufficient to allow a foreign corporation to be "found" in a district for purposes of Section 1782.

---

[121]   Courts in other circuits take the same approach. *See, e.g.*, *Group Mex. SAB de CV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573, 575-77 (5th Cir. 2016) (Cayman Islands company "indisputably 'resides or is found in' the district" based on fact that it had office space and personnel there); *In re Super Vitaminas, S.A.*, No. 17-mc-80125-SVK, 2017 WL 5571037, at *2 (N.D. Cal. Nov. 20, 2017) (corporation "found" in district "because it maintains two offices in this [d]istrict"); *In re TPK Touch Sols. (Xiamen) Inc.*, No. 16-mc-80193-DMR, 2016 WL 6804600, at *2 (N.D. Cal. Nov. 17, 2016) (corporation "maintains an office in this district and is 'found' here for purposes of Section 1782"); *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016) ("Through these in-district offices, [the corporations] conduct systematic and continuous local activities and thus may be found within the Northern District for the purposes of Section 1782.") (internal quotation marks omitted); *In re Republic of Ecuador*, Nos. C 11-80171, C 11-80172, 2011 WL 4434816, at *2 (N.D. Cal. Sep. 23, 2011) (corporation "found" in district because it "maintains an office … in this district").

(a)  **Deutsche Bank Securities Inc.**

DBS maintains its principal place of business within the Southern District of New York and conducts systematic and continuous business here. According to DBS' Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, filed with the Securities and Exchange Commission on November 20, 2018, DBS' "principal office and place of business" is located at 345 Park Avenue, New York, New York.[122]

In forms filed with the Securities and Exchange Commission, DBS also represented that it conducted investment advisory services at three other locations, in addition to its principal office and place of business; one of those offices is also in the Southern District of New York, at 60 Wall Street, New York, New York.[123]  This is also the address provided for DBS in Amendment No. 1 to the Form F-1 Registration Statement filed by TME on December 3, 2018.[124] As such, upon information and belief, the discovery sought by Petitioner is related to business conducted by DBS in this District and is located in this District. By maintaining its principal place of business, and two of its four offices, within the Southern District of New York, DBS has a significant, continuous presence in New York and thus is "found" in this District.

(b)  **J.P. Morgan Securities LLC**

J.P. Morgan also maintains its principal place of business within the Southern District of New York and conducts systematic and continuous business here. As a broker-dealer, J.P. Morgan files periodic Financial and Operational Combined Uniform Single Reports ("FOCUS Reports") with the Securities and Exchange Commission. In its last such report, dated February 28, 2018, J.P. Morgan represented that its principal place of business is located at 383 Madison Avenue, New

---

[122]  Sharma Decl., Ex. 8 (first page of DBS' Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, dated November 20, 2018).
[123]  Sharma Decl., Ex. 9 (Investment Adviser Firm Summary, filed by Deutsche Bank Securities Inc.).
[124]  Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1).

York, New York.[125] This is also the address provided for J.P. Morgan in Amendment No. 1 to the Form F-1 Registration Statement filed by TME on December 3, 2018.[126] As such, upon information and belief, the discovery sought by Petitioner is related to business conducted by J.P. Morgan in this District and is located in this District. By maintaining its principal place of business within the Southern District of New York, J.P. Morgan has a significant, continuous presence in New York and thus is "found" in this District.

(c)    **Merrill Lynch, Pierce, Fenner & Smith Incorporated**

Merrill Lynch maintains its principal place of business within the Southern District of New York and conducts systematic and continuous business here. As a broker-dealer, Merrill Lynch also files FOCUS Reports with the Securities and Exchange Commission. Intentional misstatements or omissions of facts made in FOCUS Reports constitute federal criminal violations.[127]  In its last such report, dated October 24, 2018, Merrill Lynch represented that its principal place of business is One Bryant Park, New York, New York.[128]  Merrill Lynch also has an address within this District at 50 Rockefeller Plaza, NY1-050-12-01, New York, New York, the address provided for Merrill Lynch in Amendment No. 1 to the Form F-1 Registration Statement filed by TME on December 3, 2018.[129]  As such, upon information and belief, the discovery sought by Petitioner is related to business conducted by Merrill Lynch in this District and is located in this District. By maintaining its principal place of business within the Southern District of New York,

---

[125]   Sharma Decl., Ex. 10 (FOCUS Report, Form X-17A-5/A, filed by J.P. Morgan Securities LLC for the period January 1, 2017 to December 31, 2017).
[126]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1).
[127]   Sharma Decl., Ex. 11 (FOCUS Report, Form X-17A-5/A, filed by Merrill Lynch, Pierce, Fenner & Smith Incorporated for the period July 1, 2018 to September 30, 2018).
[128]   Sharma Decl., Ex. 11 (FOCUS Report, Form X-17A-5/A, filed by Merrill Lynch, Pierce, Fenner & Smith Incorporated for the period July 1, 2018 to September 30, 2018).
[129]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1).

Merrill Lynch has a significant, continuous presence in New York and thus is "found" in this District.

(d)    <strong>Morgan Stanley & Co. LLC</strong>

Morgan Stanley also maintains its principal place of business within the Southern District of New York and conducts systematic and continuous business here. As a broker-dealer, Morgan Stanley also files FOCUS Reports with the Securities and Exchange Commission. In its last such report, dated March 1, 2018, Morgan Stanley represented that its principal place of business is 1585 Broadway, New York, New York.[130]  This is also the address provided for Morgan Stanley in Amendment No. 1 to the Form F-1 Registration Statement filed by TME on December 3, 2018.[131] As such, upon information and belief, the discovery sought by Petitioner is related to business conducted by Morgan Stanley in this District and is located in this District. By maintaining its principal place of business within the Southern District of New York, Morgan Stanley has a significant, continuous presence in New York and thus is "found" in this District.

<strong>2.    The Discovery Sought Is For "Use" In A Foreign Proceeding</strong>

The Arbitration is a foreign proceeding for purposes of Section 1782. "Proceeding[s] in a foreign or international tribunal" include adjudicative proceedings before foreign courts, administrative and quasi-judicial proceedings, foreign criminal investigations, and governmental entities acting as state instrumentalities or "with the authority of the state."  *Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999); *see also In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 460-61 (2d Cir. 2014). The Supreme Court has noted that the language of Section 1782 encompasses

---

[130]   Sharma Decl., Ex. 12 (FOCUS Report, Form X-17A-5/A, filed by Morgan Stanley & Co. LLC for the period January 1, 2017 to December 31, 2017).
[131]   Sharma Decl., Ex. 7 (Form F-1, Amendment No. 1).

"administrative and quasi-judicial proceedings abroad," including "investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Intel*, 542 U.S. at 258.[132]

CIETAC, before which the Arbitration is pending, was established in 1956 by the Government Administration Council of the Central People's Government of the People's Republic of China.[133] CIETAC operates within the China Council for the Promotion of International Trade, a foreign trade and investment promotion agency of the Chinese government, and CIETAC's "[a]rbitration rules [are] formulated by the China Council for the Promotion of International Trade."[134] As such, CIETAC operates with the authority of the Chinese state. Courts throughout the Second Circuit have confirmed awards issued by CIETAC. *Tianjin Port Free Trade Zone Int'l Trade Serv. Co. v. Tiancheng Chempharm, Inc. USA*, No. 17-CV-4130 (JS)(AYS), 2018 WL 2436990, at *1 (E.D.N.Y. May 30, 2018) (granting petition to confirm CIETAC award); *Calbex Mineral Ltd. v. ACC Res. Co., L.P.*, 90 F. Supp. 3d 442, 466 (W.D. Pa. 2015) (granting petition to confirm CIETAC award); *Jiangsu Changlong Chemicals Co. v. Burlington Bio-Med. & Sci. Corp.*, 399 F. Supp. 2d 165, 169 (E.D.N.Y. 2005) (granting petition to confirm CIETAC award); *Coutinho Caro & Co. U.S.A. v. Marcus Trading, Inc.*, No. 3:95CV2362(AWT), 2000 WL 435566, at *3 (D. Conn. Mar. 14, 2000) (granting petition to confirm CIETAC award); *Anhui Provincial*

---

[132]   Moreover, "the Supreme Court's decision in *Intel* (and post-*Intel* decisions from other district courts) indicate that Section 1782 does indeed apply to private foreign arbitrations." *Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC*, No. CIV.A. 08-135-GMS, 2008 WL 4809035, at *1 (D. Del. Oct. 14, 2008); *see also In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 520 (S.D.N.Y. 2016) (finding that the London Maritime Arbitration Association "is a 'foreign tribunal' within Section 1782" and noting that the "[t]he Second Circuit has not weighed in on this issue" in light of *Intel*); *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 291 (S.D.N.Y. 2010), *as corrected* (May 10, 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) (finding that "a tribunal established by an international treaty . . . and pursuant to UNCITRAL rules" is a "foreign or international tribunal" for purposes of Section 1782)*; see also Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09 MC 265 (JBA), 2009 WL 2877156, at *3 (D. Conn. Aug. 27, 2009).
[133]   RC Decl. ¶ 6.
[134]   RC Decl. ¶ 8 & Ex. B (May 4, 1956 Council Decision) at ¶ 12.

*Imp. & Exp. Corp. v. Hart Enterprises Int'l, Inc.*, No. 96 CIV. 128 (LAK), 1996 WL 229872, at *1 (S.D.N.Y. May 7, 1996) (granting petition to confirm CIETAC award).

 To establish that the information sought is for "use" in a foreign proceeding, it is sufficient to show that Petitioners have "the procedural right to submit the requested documents to" the foreign tribunal. *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017). Petitioners are not required to show that the information sought would be discoverable or admissible in the foreign proceedings. *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application."). Petitioner plainly satisfies the "use" requirement. Petitioner bears the burden of proof on his claims in the Arbitration,[135] and to meet that burden, CIETAC Rules permit the submission of "documentary and other evidence,"[136] which, as illustrated by CIETAC's Guidelines on Evidence, includes "documents in printed and hand-written form," "electronic data (e.g. electronic documents, e-mails) and any other readable evidence in an electronic form" like the documents requested here.[137]

 Moreover, the Underwriters possess information that is highly material to the Arbitration. IPO underwriters help the company prepare for the IPO and create registration statements and prospectuses for potential investors, describing the business of the company, the planned use for the capital raised by the IPO, the basics of the IPO and any legal issues the company may have. In the course of preparing for an IPO, therefore, underwriters do considerable due diligence. In fact, they are required to do so, because underwriters face potential liability if a registration statement is

---

[135] RC Decl. ¶ 15.
[136] RC Decl. ¶ 15, Ex. C (CIETAC Arbitration Rules), §§ 12.2, 15.2, 16.2, 18.2.
[137] RC Decl. ¶ 16 & Ex. D (CIETAC Guidelines on Evidence, Article 6).

materially false or misleading. *See* 15 U.S.C. § 77k(a)(5). The goal of that due diligence review is to independently investigate and verify information about the company and its business to ensure the information contained in the registration statement is accurate and that the registration statement includes all information about the company's business, operations and financial condition and prospects that would be material to investors. Accordingly, an underwriter will commonly request and review documents and records regarding the company and its operations, ask questions of management, key employees and the accountants, and review public records and other outside sources on legal, business, financial and accounting information about the company.

The Subpoenas seek documents related to the Underwriters' due diligence of the TME IPO.[138] In preparing for an IPO that listed a company valued at $1 billion, the Underwriters must have conducted extensive due diligence into TME's corporate structure and history, including the structure and history of CMC, its predecessor. The Underwriters would also have conducted due diligence into CMC's business relationships, including those that did or should have appeared on Xie's Agreement List in 2013. As such, the Underwriters likely have in their possession and control documents highly material to the Arbitration, including on the subjects of, *inter alia*, CMC's contracts with third parties (including, but not limited to, Li); the fraudulent transfer of CMC ownership from Guo to Xie; the involvement of other Arbitration Respondents in the fraud; and Tencent's supervision, or lack thereof, of Xie's investments.

### 3.   Petitioner Is An "Interested Person"

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or*

---

[138]   *See* Sharma Decl. Exs. 2-5.

*Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s] who may invoke § 1782." *Intel*, 542 U.S. at 256. Petitioner is the claimant in the Chinese Arbitration and is therefore an "interested person" under Section 1782.

### C.     The Discretionary Factors Of Section 1782 Weigh In Favor of Permitting the Discovery Petitioner Seeks

Once the statutory requirements of Section 1782 are met, courts considers four discretionary "*Intel* factors." *See Brandi-Dohrn*, 673 F.3d at 80-81. Each of these factors weighs in favor of granting the requested discovery. *First*, the Underwriters are not parties to the Arbitration, and therefore this discovery could not be sought there. *Second*, there is no reason to believe that the Arbitration tribunal would be unreceptive to evidence obtained through Section 1782 discovery; on the contrary, the case will be a fact-intensive proceeding to which the discovery sought is directly relevant. *Third*, Petitioner is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, the requests are carefully circumscribed and targeted to key questions in the Arbitration so as to avoid undue burden on Underwriters.

### 1.     Because The Underwriters Are Not Parties To The Arbitration, The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Here, the Underwriters are not parties to the Arbitration.[139]

---

[139]   *See* RC Decl., Ex. A (Request for Arbitration).

Further, the need for non-party cooperation is acute in the present case. Arbitration Respondents' fraud against Guo provides evidence that Arbitration Respondents are unlikely to cooperate in good faith with the Arbitration. Moreover, CIETAC Rules do not provide a procedure for obtaining discovery from third parties (especially foreign third parties) such as the Underwriters.[140] As such, in the absence of discovery pursuant to Section 1782, non-party discovery is unlikely to be available.

### 2.      Because CIETAC Is Likely To Be Receptive To The Evidence Sought, The Second *Intel* Factor Favors Granting Discovery

Under the second *Intel* factor, this Court looks to whether the foreign tribunal would be receptive to evidence obtained through Section 1782. *See In re Application of OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing second factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782").

There is a strong presumption that foreign tribunals will be receptive to evidence obtained in the United States. The Second Circuit has held that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). A court should only deny discovery on the basis of lack of receptiveness where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

---

[140]   RC Decl., Ex. C (CIETAC Rules) at Article 41 (providing that "[t]he arbitral tribunal may specify a time period for *the parties* to produce evidence and *the parties* shall produce evidence within the specified time period.") (emphasis added); *see also id.* at Ex. D (CIETAC Guidelines on Evidence) at Article. 7.1 (providing that "[a] party may request the tribunal to order *the other party* to produce a specific document or a narrow and specific category of documents") (emphasis added).

In this case, there is no such authoritative proof. In fact, CIETAC Rules permit tribunals to receive all kinds of evidence, including evidence obtained from Section 1782 proceedings.[141] CIETAC Rules also explicitly account for the presentation of documentary evidence obtained from outside China.[142] Moreover, Petitioner's Chinese counsel has represented to this Court that he has no reason to believe that a CIETAC tribunal would reject the consideration of any evidence obtained from Section 1782 proceedings.[143]

Courts have also found that Chinese tribunals *are* receptive to American federal judicial assistance. *In re Ex Parte Application of TPK Touch Sols. (Xiamen) Inc*., No. 16-MC-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17, 2016) (granting motion and finding second *Intel* factor weighed in favor of petitioner seeking discovery for use before China's People's Court and the Chinese Patent Office). Further, courts have determined that the receptivity of a foreign court to U.S. federal judicial assistance may be inferred from the existence of treaties that facilitate cooperation between the U.S. federal judiciary and the foreign jurisdiction. *See In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (foreign jurisdiction "has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation"); *In re Application of Imanagement Serv*s. Ltd., No. CIV.A. 05-2311(JAG), 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) (same). China has ratified the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters and signed a Mutual Legal Assistance Treaty with the United States.[144]  As such, the second *Intel* factor, the receptivity of the foreign tribunal to evidence obtained through Section 1782, favors Petitioner's Application.

---

[141]  RC Decl., ¶ 16.
[142]  RC Decl., ¶ 16.
[143]  RC Decl., ¶ 17.
[144]  *See* Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (also known as the Hague Evidence Convention) (United States and China have both signed and ratified the convention);

### 3.   Because Petitioner Does Not Seek To Circumvent Restrictions On Evidence, The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  Here, the discovery sought does not attempt to circumvent proof-gathering restriction. Instead, CIETAC Rules explicitly account for the presentation of documentary evidence obtained from outside China.[145]

There is also no reason to believe that any of the discovery sought in the Subpoenas violates public policy. Petitioner does not seek customer account information, state secrets, or attorney-client communications. Moreover, if the Underwriters reasonably believe that any individual documents present such concerns, Petitioner is willing to consider accommodating such concerns, such as by stipulating to a protective order. *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.").

### 4.   Because The Requests Made In The Subpoenas Are Limited, The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. *In re Bayer AG*, 146 F.3d 188, 195 (3d

---

Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters, entered into force March 8, 2001, available at https://www.state.gov/documents/organization/126977.pdf.

[145]   RC Decl. ¶ 16 & Ex. C (CIETAC Rules), Article 6.3 ("Unless otherwise agreed by the parties or determined by the tribunal after consultation with the parties, when submitting a document that originates in a jurisdiction outside Mainland China, notarization and certification of that document is not required.")).  It is also worth noting that the *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself. *See Brandi-Dohrn*, 673 F.3d 76, 82 (2d Cir. 2012).

Cir. 1998). Here, the requests are narrowly tailored and directly relevant to questions in the Arbitration. As such, whatever burden the Underwriters may incur by producing the requested discovery, it is both modest and proportionate given the circumstances. The Arbitration Respondents committed fraud against Guo in an effort to hide the true nature of Guo's assets and equity value, which is reason to believe the Arbitration Respondents may do the same to financial information critical to the success of the Arbitration. Accordingly, relative to the limited requests made in the Subpoenas, the information the Underwriters obtained in their independent due diligence review is of exceptional value.

## III.   CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the Application and Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached to the Sharma Declaration as Exhibit 1, (c) authorize Petitioner, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas attached to the Sharma Declaration as Exhibits 2 through 5; and (d) grant any and all other relief to Petitioner as deemed just and proper.

Dated: New York, New York
December 5, 2018

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Tai-Heng Cheng*

Tai-Heng Cheng
Renita Sharma
Yixuan Zhu
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100
taihengcheng@quinnemanuel.com
renitasharma@quinnemanuel.com
yixuanzhu@quinnemanuel.com